## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 3:11 CR 00034-1 |
| | ) | Judge Marvin E. Aspen |
| DAVID E. MILLER | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Presently before us is a motion by the United States of America for an order of forfeiture against Defendant David Miller. The motion follows a jury trial in which Miller was found guilty of making false statements to a bank in violation of 18 U.S.C. § 1014. The Government seeks a personal money judgment in the amount of $337,500, pursuant to 18 U.S.C. 982(a)(2)(A), and requests that judgment be entered as to both Counts One and Four of the Second Superseding Indictment. If property subject to forfeiture cannot be located for any reason, the Government seeks forfeiture of any property of the same value described as substitute property under 21 U.S.C. § 853(p). Miller has argued that the Government cannot establish that the $337,500 in loan proceeds at issue in this case were "obtained directly or indirectly, as the result of such violation." (Opp'n at 1 (citing 18 U.S.C. § 982(a)(2)); Suppl. Opp'n at 8–13.) The background of the charge has been articulated in previous orders and will not be repeated here.

As indicated at the November 19, 2012 hearing on this issue, we have granted the Government's request for forfeiture. This opinion supplements the judgment entered in this case and sets forth our reasoning in greater detail.

1

**ANALYSIS**

**1.      Forfeiture Standard**

When imposing sentence on a person convicted under § 1014, the court "shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."  18 U.S.C. § 982(a)(2).  In other words, § 982(a)(2) requires "forfeiture of proceeds that result from" illegal conduct.  *U.S. v. Warshak*, 631 F.3d 266, 332 (6th Cir. 2010).

In addition, the criminal forfeiture of property under § 982 incorporates 21 U.S.C. § 853, which explains that criminal forfeiture of property is to be "liberally construed to effectuate [the statute's] remedial purposes."  21 U.S.C. § 853(o).  Further, § 853(p) allows for forfeiture of "substitute property" if the "proceeds obtained, directly or indirectly, as a result of such violation" are not available to satisfy the judgment due to an act or omission of the defendant.  21 U.S.C. § 853(a), (p).  In such a case, "the court shall order the forfeiture of any other property of the defendant, up to the value of" the absent property.  21 U.S.C. § 853(p).

Criminal forfeiture procedures are governed by Rule 32.2 of the Federal Rules of Criminal Procedure.  Rules 32.2(b) governs when "the government seeks a personal money judgment," and provides that "the court must determine the amount of money that the defendant will be ordered to pay."  Fed. R. Crim. P. 32.2(b)(1)(A).[1]  To determine the appropriate forfeiture amount, the court may rely on evidence already in the record as well as any other evidence

---

[1]  If the government seeks forfeiture of specific property, the Rule provides for additional procedures, including a determination of "whether the government has established the requisite nexus between the property and the offense."  Fed. R. Crim. P. 32.2(b); *see also Libretti v. U.S.*, 516 U.S. 29, 42, 116 S. Ct. 356, 364 (1995) ("Section 853 limits forfeiture by establishing a factual nexus requirement.").

submitted by the parties and accepted by the court. Fed. R. Crim. P. 32.2(b)(1)(B). "The Government must prove forfeiture by a preponderance of the evidence." *U.S. v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007) (citing *U.S. v. Hall*, 411 F.3d 651, 654–55 (6th Cir. 2005)).

**2.      Sufficiency of the Evidence**

Miller argues that the $337,500 loan proceeds are not subject to forfeiture because the Government has failed to make the requisite showing that he obtained the $337,500 as a direct or indirect result of the crime. At trial, the jury found beyond a reasonable doubt that Miller made a material false statement to First Bank with the purpose of influencing the bank. (Jury Verdict (Dkt. No. 84).) The jury was not asked, however, to decide whether Miller's statement in fact influenced the bank; nor were they asked to decide whether the $337,500 in loan proceeds were obtained as a result of the false statement. Therefore, we must now decide whether the Government has established by a preponderance of the evidence that the loan proceeds were obtained as a direct or indirect result of Miller's § 1014 violation.

*a.      First Bank's Reliance on the Resolution*

Miller bases his assertion—that the loan proceeds were not a result of the crime—on an interrogatory answered by First Bank during separate litigation between First Bank and Fellowship Investors, LLC ("FI"). The interrogatory was introduced into evidence at this trial through the testimony of Allen Green, a Senior Vice President at First Bank who served as Miller's loan officer. The interrogatory reads, in relevant part:

> Q: Identify all proof the First Bank has that the members of Fellowship Investors, LLC authorized David Miller and/or William Wellons to hypothecate the Property to [] First Bank.
>
> A: . . . the authorization is shown by the Operating Agreement of Fellowship Investors, LLC, which in Section 6.1 (A), expressly authorized the manager (David E. Miller) to

3

> conduct the business of the company without the consent or joinder of any member, and which, in Section 3.2, expressly authorized, *inter alia*, both the purchase and mortgaging of the company's real property. The authority is also evidenced by the subsequent Resolution of The Members of Fellowship Investors, LLC, although First Bank believes that the resolution was not necessary in light of the authority expressly conferred on Mr. Miller in the Operating Agreement.

(Opp'n, Ex. 1 ¶ 13 (First Bank Interrog.).) Miller contends that this response proves that First Bank believed he had the authority to pledge the collateral on behalf of FI and would have made the loan without the resolution—and, thus, without reliance on the false statement. (Opp'n at 1, 4–7; Suppl. Opp'n at 9–13.) Therefore, Miller explains, he did not obtain the $337,500 "as a result of" the § 1014 violations.

Of course, we must temper the weight given to this answer with other evidence provided at trial. On cross-examination, Green admitted that he made statements contradicting this answer only four months after signing the interrogatory. (Green Tr. at 11 (Dkt. No. 98).) Specifically, he told investigating agents that "the bank required a third-party pledge in the form of a resolution in order to approve Mr. Miller's loan." (*Id*. at 11; *see also id.* 17–18 (admitting he told the agents "First Bank needed that resolution").) On re-cross examination, Green explained that the interrogatory answer was drafted with the specific purpose of protecting the bank's interest in the collateral during the suit between the bank and Fellowship Investors. (*Id*. at 17.) He clarified that Miller "never showed the financial capacity to obtain a loan on his own." (*Id*.)

The Government further called two witnesses who testified that First Bank in fact relied on the resolution. First, Joseph Stoker, an Area Manager at First Bank when the loan was issued and the employee that approved the loan, testified at trial. After explaining that the resolution was important because it indicates who is authorized to pledge the collateral, Stoker stated that

the document was required for closing. (Stoker Tr. at 13 (Dkt. No. 97).) Mr. Stoker on cross-examination reiterated that "[t]he resolution would have always been required." (*Id*.) Second, Diann Harrison, a First Bank employee responsible for determining the type of documents the bank required to process a given loan, also testified. (Harrison Tr. at 4 (Dkt. No. 99).) Harrison stated that the bank "would need" a resolution from the property owners to prove that Miller had authorization to pledge the property as collateral. (*Id*. at 11; *see also id*. at 13 (stating the resolution "would be required" for a loan of this nature).) During cross-examination, Harrison confirmed that it was First Bank's position to always require a resolution. (*Id*. at 54.)

This additional evidence refutes the assertion in the interrogatory that the resolution was not necessary. We find that the Government has proven by a preponderance of the evidence that the resolution submitted by Miller was necessary in obtaining the loan, along with other closing documents, such as the multipurpose note and security deed. As the assertions in the resolution and the note formed the basis for Miller's § 1014 conviction, it follows that the $337,500 in loan proceeds were a direct result of his criminal activity.

> b. *Timing of Miller's Execution of the Resolution*

Miller also contends that First Bank could not have relied on his misrepresentations in the resolution because it was not involved at closing on May 30, 2007. (Suppl. Opp'n at 11.) He testified that he was unaware that First Bank had requested a resolution until May 25, 2007, when Bill Wellons requested the names of the investors to list on the FI resolution. (Miller Tr. at 24 (Dkt. No. 104).) Miller testified that no one sent him the resolution prior to closing and that he did not recall anyone reviewing the resolution with him at closing. (*Id.* at 25, 28.) Although Miller did not deny that his signature appeared on the resolution, he testified that he did not

recognize it when he first saw it and could not figure out where it came from.[2] (*Id.* at 29, 42–43, 55, 65.)  When he requested a set of the closing documents from the closing attorneys, the loan binder did not include the resolution.  (*Id.* at 42.)  Accordingly, Miller asserts now that there is no evidence the resolution was signed by him prior to or at closing.

We again must consider Miller's testimony along with the other evidence presented at trial about the origin of the resolution.  While Miller cannot recall how or when his signature came to be on the resolution, the document plainly shows his signature dated May 25, 2007.  Miller testified, and evidence corroborated, that he had requested a copy of it that same day.  (*Id.* at 24–25.)  Although Miller testified he had not been aware that any resolution was in the works prior to May 25, 2007, Bill Wellons testified that Miller previously told him a resolution would be needed, along with another document, prior to closing.  (Wellons Tr. at 14–18, 71 (Dkt. No. 103).)  Wellons thus signed the two documents and provided them to the closing attorneys before leaving town.  (*Id.* at15–16, 27–31.)  Miller denied any conversation with Wellons about a resolution.  (Miller Tr. at 28 (Dkt. No. 104).)

In addition, although the closing attorneys' loan binder did not include the resolution with Miller's signature, the First Bank loan file did.  (Miller Tr. at 41–42, 63 (Dkt. No. 104).)  Miller obtained a copy of the fully-executed resolution somehow, because his development copy faxed it to the bank on July 23, 2007, several weeks after closing.  (*Id.* at 29, 47–48.)  When asked to explain these numerous discrepancies, Miller testified simply that he didn't think about the

---

[2] Miller does not deny signing the multipurpose note and security deed, which similarly included the misrepresentation of the scope of his authority to pledge the collateral.  As the Government emphasized at the November 19, 2012 hearing, its case rests not only on the resolution but on the note as well.

resolution even though he had not seen it despite his request for a copy on May 25, 2007, that he did not read every word of every document at closing, and that no one (including his trusted assistant or closing attorneys) brought it to his attention.  (*Id.* at 25–29, 56–57.)

Despite Miller's disavowals, the Government presented sufficient evidence at trial demonstrating that Miller was aware of and executed the resolution as a necessary part of the closing.  The documentary evidence adequately shows that Miller signed the resolution in preparation for closing, and Miller did not offer any alternate explanation as to how or when he might have signed the resolution.  Even if Miller signed the resolution on May 25, 2007—as the resolution and related document trail suggests—but did not see it again at closing several days later—if we choose to credit his testimony—the Government has shown that First Bank required the resolution, received it as signed by Wellons and Miller for closing, and relied on it.  For these reasons, Miller must forfeit $337,500.[3]

**IT IS HEREBY ORDERED THAT:**

1. As the result of Defendant David Eugene Miller's conviction as to Count One of the Second Superseding Indictment, for which the Government sought forfeiture pursuant to 18 U.S.C. § 982, Defendant Miller shall forfeit to the United States his interest in the following: $337,500 in United States currency representing the proceeds of the offense for which Defendant Miller has been convicted and substitute assets if such currency cannot be located (hereinafter referred to as "Subject Property").  Said $337,5000 in United States currency is proceeds from the offense of which Defendant was convicted.

---

[3] The Government initially requested a money judgment as to both Counts One and Four. However, the same loan proceeds are at issue in both counts.  Therefore, we will enter an order only as to Count One.

2. The Court has determined, based on relevant and reliable evidence, including facts already in the record, and any additional evidence or information submitted by the parties, that the Subject Property is proceeds of the offense of conviction and therefore is subject to forfeiture pursuant to 18 U.S.C. § 982(a)(2)(A), and nexus is established between the $337,500 in United States currency and the offense of conviction.

3. Upon the entry of this Order, the Attorney General (or his designee) is authorized to seize the Subject Property and to conduct any discovery proper in identifying, locating or disposing of the property subject to forfeiture in accordance with Fed. R. Crim. P. 32.2 (b)(3).

4. Pursuant to 18 U.S.C. § 982, Defendant shall forfeit to the United States the sum of $337,500 in United States currency and, by virtue of this Order, a personal Money Judgment in that amount shall enter against Defendant. Pursuant to Fed. R. Crim. P. 32.2(b)(3), this Order of Forfeiture consisting of a Money Judgment in the amount of $337,500 in United States currency shall become final as to Defendant at the time of sentencing, or before sentencing if Defendant consents, and shall be made part of the sentence and included in the Judgment. Pursuant to Rule 32.2(c)(1) "no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment."

5. Neither the United States through the exercise of due diligence, nor Defendant have, as of this date, identified specific assets that were derived from the $337,500 in proceeds attributable to the offenses for which Defendant has been convicted. Nor has the United States or Defendant yet identified any property of the Defendant that could be forfeited as a substitute asset in accordance with 21 U.S.C. § 853(p). Therefore, as a result of an act or omission of Defendant, said proceeds cannot be located upon the exercise of due diligence; have been

transferred or sold to or deposited with a third party; have been placed beyond the jurisdiction of the court; have been substantially diminished in value; or have been co-mingled with other property which cannot be divided without difficulty. Therefore, the United States may, at any time, move pursuant to Rule 32.2(e) to amend this Order of Forfeiture consisting of a Money Judgment of $337,500 in United States currency to substitute property having a value not to exceed $337,500 in United States currency to satisfy the Money Judgment in whole or in part.

6. This Money Judgment against Defendant shall be recorded in the records of the County Clerk's Office in the county of Defendant's residence and any and all other counties in which Defendant has either real or personal property as a lien thereon in the amount of $337,500 plus interest at the current legal rate computed daily and compounded annually until paid in full, as determined by the United States; and

7. Upon the payment of the Money Judgment in full, that the United States shall file a Satisfaction of Judgment with the District Court and the appropriate Clerk of the County in which any transcript or abstract of the judgment has been filed; and

8. This Order is in continuing and full effect until payment of the $337,500 is made in full.

9. The Court shall retain jurisdiction to enforce this Order and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

It is so ordered.

_____
Marvin E. Aspen
United States District Judge


Dated:        Chicago, Illinois
           December 10, 2012