UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | 3:11 CR 00034-1 |
| ) | Judge Marvin E. Aspen |
| DAVID E. MILLER ) | |

## MEMORANDUM OPINION AND ORDER

On May 11, 2012, a jury found David Miller guilty of two counts of making false statements to a bank in violation of 18 U.S.C. § 1014 and two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). On November 19, 2012, we held a hearing to address both the Government's request for forfeiture as well as Miller's objections to the sentencing guideline calculations contained in the Presentence Report and advanced by the Government. At the conclusion of that hearing, we sentenced Miller to a total term of forty-five months imprisonment and imposed a total term of supervised release of two years. (Am. Judgment, Dkt. No. 124.) This opinion supplements the oral findings expressed at the sentencing hearing and elaborates the court's reasoning. The background of the charge has been articulated in previous orders and will not be repeated here.

## ANALYSIS

**A.    Objection No. 1: Amount of Loss Calculation**

The Sentencing Guidelines authorize an increase in a defendant's base offense level based on the amount of the loss at issue. U.S.S.G. § 2B1.1. This calculation may include either the actual or intended loss, whichever is greater. *Id.*, Applic. Note 3(A). Actual loss includes

1

"the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, Applic. Note 3(A)(i). Intended loss refers to "the pecuniary harm that was intended to result from the offense" and also includes any such harm "that would have been impossible or unlikely to occur." *Id.*, Applic. Note 3(A)(ii). When evaluating the amount of loss, we must exclude certain items and offer the defendant credit for others. Specifically, and as relevant here, we reduce the loss amount by any "money returned . . . by the defendant or persons acting jointly with the defendant, to the victim, before the offense was detected." *Id.*, Applic. Note 3(E)(I).

We must "determine the amount of loss by a preponderance of the evidence" and our findings will not be disturbed "unless they are clearly erroneous." *U.S. v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2005). Our factual determination that the facts warrant "application of a particular guideline provision is purely a legal question," however, and is subject to *de novo* review. *Id.* (internal quotation omitted); *see also U.S. v. Warshak*, 621 F.3d 266, 328–29 (6th Cir. 2010); *U.S. v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006).

1. **Actual Loss**

We begin with Miller's challenges to an increase based on actual loss.[1] As described in his written objections and at the November 19, 2012 hearing, Miller contends that this case involves zero actual loss for two reasons. First, Miller asserts that there is no causal connection between the offense conduct and First Bank's loan because the bank did not rely on his alleged false statements. Second, First Bank suffered no loss because the $337,500 loan was eventually

---

[1] The Government has further claimed that the loan amount could be considered intended loss for purposes of a sentencing enhancement, which Miller also disputes. Because we have concluded that this amount represents an actual loss to First Bank warranting the enhancement, we need not address this alternate argument.

repaid in full.

We reject Miller's first argument for the same reasons set forth in our opinion ordering forfeiture of the entire loan amount, also entered today. As explained in the forfeiture order, we conclude that the Government has proved, by a preponderance of the evidence, that First Bank required and relied on the resolution (and multipurpose note and security deed) signed by Miller, which wrongfully asserted that he had the authority to pledge collateral on behalf of Fellowship Investors, LLC ("FI"). In other words: but for Miller's false statements misrepresenting the scope of his authority, First Bank would not have approved the loan. We thus find the actual loss to First Bank in this case totals $337,500.

Miller's second argument fares no better. According to Miller, we should credit him the full amount of repayment of the loan because he voluntarily self-disclosed his mistake to the FI investors and arranged for repayment of the debt. The parties dispute who ultimately repaid First Bank and whether Miller was capable of making that payment personally due to a then-pending bankruptcy. The parties also dispute whether Miller genuinely disclosed the extent of his wrongdoing in his July 13, 2009 email to the FI investors, or whether he disclosed the existence of the loan only because FI faced foreclosure and he faced federal investigation. As indicated at the hearing, we find these factual and policy arguments interesting but irrelevant.

The Sentencing Guidelines unambiguously provide that, once actual loss has been calculated, the court must reduce that amount by "(1) the amount paid by the defendant *before* the fraud was discovered, and (2) the amount of collateral that has been collected *at the time of*

*sentencing.*"[2] *U.S. v. Erpenbeck*, 532 F.3d 423, 431 (6th Cir. 2008) (emphasis in original); *see* U.S.S.G. § 2B1.1, Applic. Note 3E(I); *U.S. v. Yaroch*, No. 07 C 20243 & 08 C 50303, 2008 WL 2129846, at *25–27 (E.D. Mich. May 19, 2008). "The credit for money returned by a defendant or someone acting jointly with him applies only when payment was made before the crime was detected." *U.S. v. Wirth*, 437 F. Supp. 2d 688, 692 (E.D. Mich. 2006). Here, First Bank was repaid (whether by Miller, a related entity, or a third party) in April 2010. Miller purportedly disclosed the wrongdoing by email dated July 13, 2009 and was subject to federal investigation by October 2009. (*See* Miller Tr. at 46 (Dkt. No. 104); Dorroh Tr. at 66 (Dkt. No. 115).) Regardless of which date we choose to mark the time Miller's crime became known, no payment had yet been made to First Bank on the loan. Miller may not take advantage of this credit mechanism within the Sentencing Guidelines because he did not make repayment of any kind to First Bank prior to the detection and/or disclosure of his illegal activities. As previously held, Miller's objection is overruled.

### 2. Additional Loss due to "Relevant Conduct"

Miller also contends that the loss calculation should not have included an additional $54,748, representing diverted FI funds that we deemed "relevant conduct" for sentencing purposes. Section 1B1.3(a) of the Sentencing Guidelines requires us to consider, when determining the guideline range, "all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility." U.S.S.G.

---

[2] Miller does not contend that he is entitled to any reduction in the loss amount due to the recovery of collateral. We thus focus on whether the first component reduces the amount at issue for sentencing purposes.

4

§ 1B1.3(a)(1). Miller argues that his collection of funds from the FI investors prior to closing, and subsequent use of FI funds after closing, simply do not fall under any of the three categories set forth in § 1B1.3(a)(1).

We also take into account "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."[3] U.S.S.G. § 1B1.3(a)(2). Although the terms "same course of conduct" and "common scheme or plan" are not precisely the same, they are "two closely related concepts." *Id.*, Applic. Note 9; *see also U.S. v. Koeberlein*, 161 F.3d 946, 950 (6th Cir. 1998); *U.S. v. Hill*, 79 F.3d 1477, 1482–84 (6th Cir. 1996); *Yaroch*, 2008 WL 2129846, at *24. As described by the Sentencing Guidelines, a "common scheme or plan" involves offenses that are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3(a)(2), Applic. Note 9(A). Other offenses "may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.*, Applic. Note 9(B). Factors used to evaluate the strength of that connection or relatedness include "the degree of similarity of the offenses, the regularity (repetitions) of the offense, and the time interval between the offenses." *Id.* Miller contends that his diversion of FI funds, while sloppy and problematic, is sufficiently distinct from his misrepresentations to First Bank such that it cannot be considered part of the same scheme or

---

[3] Section 1B1.3(a)(2) applies "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." Section 3D1.2(d) specifically requires grouping of offenses covered by § 2B1.1, which governs the guideline applied here to Miller. Thus, Sections 1B1.3(a)(1) and (2) both apply.

5

course of conduct.

As a preliminary matter, Miller does not contest (at least for sentencing purposes) that he diverted funds from FI for his personal use and unrelated business purposes. Nor does he argue at this stage that the $54,748 figure is inaccurate. With these points in mind, we turn to the critical issue and readily conclude that Miller's unlawful diversion of FI funds—which apparently began the day after the closing—occurred during Miller's commission of the offense of conviction.

As we consider the record before us, we cannot overlook the fact that Miller continued to assert his authority to pledge FI property months and years after the initial closing. Miller testified that he did not recall signing the resolution at closing, for example, and suggests now that he might not have signed it until July 23, 2007 when he faxed it to the bank. (Miller Tr. at 24–29, 47–48 (Dkt. No. 104).) Under that unproven theory, Miller executed the resolution after closing, further misrepresenting his authority, perpetuating his crimes and enabling his continued misappropriation of FI funds. More importantly, Miller renewed his earlier false statements to First Bank when he sought and obtained an extension of the original loan in 2008. This conduct supported Count Four of the Second Superseding Indictment, for which the jury found Miller guilty. We find that because Miller repeatedly lied to the bank to obtain and renew the loan, he received ongoing access to FI funds, which he then diverted for his own purposes.

We also find that this conduct is relevant as a part of a "common scheme or plan" under Section 1B1.3(a)(2). Miller's misrepresentations to First Bank and misuse of FI funds are substantially related because they share a common victim in FI, whose interests in the collateral Miller gambled while diverting its funds. These offenses also reveal a common purpose, shared

from the inception of the loan: allowing Miller to keep himself and his business ventures afloat, by spreading around bank and FI funds for unauthorized uses. As mentioned above, Miller's repeated misstatements further effectuated this common scheme over time. For these reasons, and as ordered at the hearing, we find that the $54,748 that Miller diverted from FI must be included as relevant conduct in the loss amount for sentencing purposes.

**B.     Objection No. 2:  Obstruction of Justice Enhancement**

Miller's second objection challenges the imposition of a two-level enhancement to his offense level for obstruction of justice. Section 3C1.1 of the Sentencing Guidelines requires us to increase the offense level if a defendant has "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" so long as the obstructive conduct relates to the offense of conviction. U.S.S.G. § 3C1.1. This two-level enhancement applies if we find that a defendant has committed or attempted to commit perjury. *Id.*, Applic. Notes 2, 4(B). A witness testifying under oath commits perjury "if [he] gives false testimony concerning a *material matter* with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *U.S. v. Dunnigan*, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993) (emphasis in original); *U.S. v. Bazazpour*, 690 F.3d 796, 807–08 (6th Cir. 2012). "Material matter" refers to "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, Applic. Note 6.

As the Supreme Court has instructed, we "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition." *Dunnigan*, 507 U.S. at 95, 113 S. Ct. at

1117. Pursuant to Sixth Circuit precedent, we follow a two-step approach for this analysis before imposing the enhancement, such that we: (1) "identify those particular portions of the defendant's testimony that" may be perjurious; and then (2) "either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates." *Bazazpour*, 690 F.3d at 808 (internal quotations omitted). In considering perjury for sentencing purposes, we bear in mind that this enhancement "is not intended to punish a defendant for the exercise of a constitutional right" and that "not all inaccurate testimony . . . necessarily reflects a willful attempt to obstruct justice." U.S.S.G. § 3C1.1, Applic. Note 2; *Dunnigan*, 507 U.S. at 95–96, 113 S. Ct. at. 1117; *see also U.S. v. Thomas*, 272 F. Appx. 479, 486–89 (6th Cir. 2008); *U.S. v. Logan*, 250 F.3d 350, 374–76 (6th Cir. 2001).

As discussed at the hearing, the Government identified five specific instances where it contends that Miller's trial testimony crossed the line into perjury.[4] We find two of these instances particularly persuasive and address them below.

### 1. Pledging FI's Property as Collateral for the Loan

At trial, Miller repeatedly testified that he did not realize he was putting up FI's interest in the property as collateral on the loan. He stated that he intended to pledge only his shares in the property as the collateral and explained that plan to the bank. (Miller Tr. at 26–27, 44, 55–57 (Dkt. No. 104).) This testimony is plainly material and relevant to the offenses for which Miller was convicted. The question presented is whether that testimony was false and made with the willful intent to obstruct justice. We agree with the Government that both remaining elements are satisfied.

---

[4] The Presentence Report also identified two of the same instances.

Miller's testimony on this point was directly contradicted by reliable record evidence. Joe Stocker with First Bank testified that he understood, based on his conversations with Miller, that the loan was secured by the property—not Miller's partial ownership interest in it. (Stocker Tr. at 5–6, 9–13 (Dkt. No. 97).) All of the loan documents themselves support this testimony and refute Miller's statements to the contrary. For example, the loan documents identify the property itself as collateral and demonstrate that First Bank calculated the loan to value ratio based on the appraisal of the property, not Miller's shares therein. (*See id.* at 9–13.) Bill Wellons testified that Miller told him they would need to take out a loan to purchase the final three shares and close on the property but then would pay back the loan with funding from new investors. Wellons also testified that Miller informed him that Wellons would need to execute two documents prior to closing, including the resolution related to the borrowing on and purchase of the property. (Wellons Tr. at 7, 13–16, 29–30, 65, 70 (Dkt. No. 103).) According to Wellons, he signed the resolution, stating that all FI members approved of the loan and hypothecation of the property, because Miller told him that all of the members had agreed. (*Id.* at 29.) Wellons' testimony also conforms with the loan documents and corroborates Stocker's testimony about the mechanics of the deal, as explained by Miller himself.

Miller's testimony, moreover, strikes us as incredible. Miller testified that—despite his many years in this industry—he did not understand that First Bank was looking for collateral for the loan. (Miller Tr. at 26–27.) Miller stated, somewhat equivocally, that it was his "impression" that he was borrowing the money against only his shares. (*Id.* at 26–27, 48–49, 56, 64.) He testified that the loan to value ratio so important to the bank, as stated by Stocker, was based on the value of his shares and not the property. (*Id.* at 26–27.) There is no evidence to

9

support any of these notions. This testimony is also inconsistent. If Miller was well within his rights to pledge his own shares, for example, neither the critical portion of the resolution, nor the third-party agreement (which he signed twice on separate days), would be necessary. (*Id.* at 48–49.) In addition, if Miller was pledging only his own interests, he would have no need to hide the existence of the loan from the other FI investors, who were shocked and threatened litigation when they learned of the loan in July 2009. (*Id.* at 58–59; Wellons Tr. at 29–30, 33–35 (Dkt. No. 103).)

Based on the above, we must conclude that Miller's testimony was knowingly false and expressly intended to affect the jury verdict. We credit the record evidence and testimony, which show that Miller knew what he was doing when he pledged the FI property as collateral for the First Bank loan. In short, Miller was untruthful at trial in his attempt to explain away his actions and dodge responsibility for this conduct.

### 2. Knowledge and Execution of the Resolution

We reach the same conclusion when we evaluate Miller's testimony about his knowledge and execution of the resolution. Miller stated under oath that he had not seen the resolution prior to or at closing, never discussed or reviewed it with anyone, did not later recognize it, could not figure out where it came from, and still does not know how or when his signature came to be on the resolution. (Miller Tr. at 24–25, 28–29, 42–43, 55, 65 (Dkt. No. 104).) This testimony flies in the face of the evidentiary trail (including documents and the testimony of Bill Wellons) showing that Miller knew the resolution was necessary, received at least one email discussing the resolution prior to closing, told Wellons to sign such a resolution, assisted Wellons by providing a copy of the operating agreement containing the FI investors' names, and possessed a copy of

the resolution bearing his signature within weeks of the closing. (*See* Wellons Tr. at 14–18, 24–25, 27–31, 71 (Dkt. No. 103).) Miller's testimony is also suspect in that he so clearly remembers some details of the closing—i.e., there was no resolution reviewed or signed that day—but cannot remember other details—i.e., pledging the property as collateral—because he "was not completely paying attention." (Miller Tr. at 50, 56–57, 64–65 (Dkt. No. 104).) In light of the evidence presented at trial, we cannot conclude that Miller's testimony feigning ignorance about the resolution resulted from "confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94, 113 S. Ct. at 1116. To the contrary, and based also on our first-hand assessment of witness credibility, we find that Miller knowingly and intentionally lied about his knowledge and execution of the resolution, in the hope of persuading the jury he made an innocent mistake or was somehow duped. Like the jury, we simply do not believe Miller. We conclude that he perjured himself at trial and reiterate that the two-level enhancement for obstruction of justice is warranted here.

## CONCLUSION

For the reasons elaborated above, and as indicated at the November 19, 2012 hearing, Miller's first and second objections to certain sentencing enhancements are overruled. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: Chicago, Illinois
December 10, 2012